### Ralph Sweeney v. The State.

No. 4899. Decided February 3, 1918.

Rehearing denied June 28, 1918.

**1.—Burglary—Statement of Facts—Bills of Exception.**

Where, upon an appeal from a conviction of burglary, it appeared from the record that the bills of exception and statement of facts were not filed within time, etc., they can not be considered, but the defects of the record having been remedied, the merits of the case are considered.

**2.—Same—Indictment—Ownership—Possession.**

Where, upon trial of burglary, the indictment alleged the possession of the burglarized house in B. C. Alexander, and the evidence showed that his possession of the property stolen therefrom was in the alleged owner for the purpose of sale, this would constitute such control as to make the same sufficient ownership and possession under the statute. Davidson, Judge, dissenting.

**3.—Same—Evidence—Other Transactions.**

Where, upon trial of burglary, the State was permitted to introduce testimony with reference to the disappearing of other property of the same kind at a different time and a different place not contemporaneous with the transaction alleged in the instant case and not shedding any light thereon, the same was reversible error. Prendergast, Judge, dissenting.

Appeal from the District Court of Tom Green. Tried below before the Hon. C. E. Dubois.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. P. Thomson,* for appellant.

*E. B. Hendricks,* Assistant Attorney General, and *J. A. Thomas,* District Attorney, for the State.—On question of other transaction: Williamson v. State, 74 Texas Crim. Rep., 289, 167 S. W. Rep., 360; Turner v. State, 73 Texas Crim. Rep., 76, 163 S. W. Rep., 705; Conatser v. State, 75 Texas Crim. Rep., 91, 170 S. W. Rep., 314; Backus v. State, 77 Texas Crim. Rep., 653, 179 S. W. Rep., 1166; Medlock v. State, 79 Texas Crim. Rep., 322, 185 S. W. Rep., 566.

DAVIDSON, Presiding Judge.—Appellant was convicted of burglary, his punishment being assessed at two years confinement in the penitentiary.

There was an order entered allowing thirty days in which to file

statement of facts and bills of exception. The bills of exception were not filed within the time allowed; in fact, they were not approved until the 24th day of October and filed November 24th. The court adjourned on the 25th of August. The bills, therefore, can not be considered. The Assistant Attorney General moves to strike out the statement of facts because not filed within any time permitted by law. As before stated, court adjourned on the 25th of August, and the statement of facts was not filed until the 24th day of November, being ninety-one days after court adjourned. We are of opinion under the decisions the Assistant Attorney General's point is well taken and should be sustained. Without the bills and statement of facts the questions presented for revision will not be decided.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

March 13, 1918.

DAVIDSON, PRESIDING JUDGE.—The judgment was recently affirmed. The defects have been remedied, and the case will be tried on the completed record.

The indictment charges burglary of a house in the possession of B. C. Alexander. Alexander is a brother of Mrs. Guthrie, who owned the house. It was a garage situated on her homestead. The property alleged to have been taken from the garage were automobile tires, they being removed from the auto which was in the garage. This occurred in February; at least the tires disappeared from the car in February. Mr. Guthrie, former husband of the owner of the house and auto, had died the preceding year. Alexander became temporary administrator, but had been discharged as such in January, prior to the alleged burglary. Mrs. Guthrie was left by the will of her husband sole executrix as well as sole heir and owner of all the property owned by Guthrie in his lifetime. She assumed control of it by virtue of the authority of the will upon the discharge of her brother, Alexander, as temporary administrator, and this occurred prior to the alleged burglary. Alexander's possession of any of the property was as agent of his sister, Mrs. Guthrie. He says: "The automobile was not my personal property, but I had control of it for the purpose of selling it. It belonged to Mrs. W. A. Guthrie. That homestead didn't belong to me. It belonged to Mrs. W. A. Guthrie. She was living on the property at the time. She has been living on that property and the property back of where she now lives ever since she married. The property has been used as a homestead and for living purposes, and has been offered for sale at different times and in different ways. I didn't own the property; I simply had control of it. I don't now recall the date of the death of W. A. Guthrie, but it was in November, 1914." He had authority, from the testimony, as the agent to sell this auto, and even the home-

stead. This was from his sister, Mrs. Guthrie. If he was in possession of the property at all, it was by virtue of the above stated facts. He had taken a gentleman by the name of Buck to see the car with a view of selling it to him. On the second trip, which was about two weeks after the first, a trade was consummated and Buck became the purchaser of the auto. Between the first and second visits of Alexander and Buck to the garage, it is claimed, the tires disappeared from the auto. In this connection we might further say as to Alexander's authority, he made this statement: "This property did not belong to me, but was in my possession for sale, and that is all." This garage was usually kept closed. It seems, however, that while he was trying to sell the car to Buck he was at the garage and found the door open and fastened the door.

The question is raised as to Alexander's ownership as alleged in the indictment. His possession of the property, if it be held he had possession, was for the purpose of sale and looking after it until he disposed of it. It is clear and beyond dispute that the garage was on Mrs. Guthrie's homestead, on the same lot on which her residence was situate, and on which she lived with her family, which it seems consisted of her mother and servants, if she had servants. We are of opinion that the testimony does not show such exclusive control, possession and management of the garage as would constitute Alexander the special owner. The mere fact that he had control of the car to the extent of selling it, and it was not in his possession but in the possession of his sister and on her homestead, would not constitute him, under our law, we think, the special owner.

There is another question presented, that is, that the evidence is not sufficient. The tires were missed in February, and found in possession of the defendant something like three and one-half or four months afterward. There is some question as to the identity of the tires, but conceding they were sufficiently identified, when appellant was found in possession of them he gave an account of his purchase. There is no other evidence in the case to connect appellant with the burglary. If the house was open when the tires were taken it could not constitute burglary, because there would be a want of breaking. If he came in possession of them from another his possession would not amount to evidence to connect him back with the burglary. Possession of property recently after the theft would be evidence against the possessor to be introduced as a fact or circumstance on his trial, but that of itself after an intervening time of four months or thereabouts would hardly be sufficient under the authorities. These authorities are found collated by Mr. Branch's Ann. P. C., on pages 1332 and 1333. In order to connect appellant with the burglary by reason of the possession of stolen property, it would be necessary to show that he was in possession of this property recently after the burglary, and, under the rules of circumstantial evidence, that he broke and entered the house. This seems to be the settled rule under all the cases. In section 2463, Branch's

Ann. P. C., page 1332, the cases are collated to the effect that to raise the presumption of guilt from the circumstance alone of possession of property recently stolen, the defendant must be shown to have been in possession thereof recently after the theft. Then follows a collation of the cases where it was held that the possession was too remote. One of them, Menchaca v. State, 58 Texas Crim. Rep., 198, held that the possession of the stolen property three and a half months was too remote, and in Yates v. State, 37 Texas, 347, five months was held to be too remote, and in Bragg v. State, 17 Texas Crim. App., 219, five and a half months was too remote.

There is another question also raised, that the court should have instructed the jury more fully with reference to the account given by appellant of his possession of the property. The court instructed the jury substantially that if appellant bought the property as claimed, or there was a reasonable doubt of this purchase, he should be acquitted. But the other question, towit: that the State having put in the purchase theory, the jury should have been informed that it devolved upon the State to prove the falsity of this statement. Upon another trial we think the court should so instruct the jury.

There is a bill of exceptions reserved to the admission of testimony with reference to the disappearance of another auto tire at a different time and a different place. Objection was urged to this admission. We are of opinion that this should not have gone to the jury. It tended in no way to throw light upon this transaction. It seems from the bill that another party had missed a tire and in tracing it up found it in appellant's possession. Appellant, ascertaining the fact, returned the tire. It was not contemporaneous with the transaction alleged in this case and shed no light upon it so far as we are able to understand from the facts or bill of exceptions.

For the reasons indicated the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

### ON REHEARING.

#### June 26, 1918.

DAVIDSON, Presiding Judge.—The State asks a rehearing with a view of setting aside the former reversal and securing an affirmance of the judgment. In a very ingenious and able argument the State makes several contentions. Among other things it is strenuously urged that the opinion was in error in holding that Alexander was not in custody, control and management of the property. In other words, that the allegation was improper in alleging in him the ownership of the automobile. In the light of what is said in the argument for the motion we have read some of the cases cited. Those cases we think were properly decided but are inapplicable to this case.

It is deemed unnecessary to restate the testimony bearing upon the ownership in Alexander, some of which was set out in the original opinion, but as we understand the evidence, Alexander was not in exclusive management and control of the property. There is no claim that he owned it, and the State's contention is only based upon the proposition that he had exclusive care, control and management of the property. We do not believe the evidence sustains this proposition. He was but the agent of the owner to sell the property, and whatever control he may have had was only with a view of making the sale. The property was not in his actual possession, nor did he have the right to manage or control it otherwise than as connected with his sale agency. It may be more than seriously questioned if he had even custody of the property, because the facts indisputably show that the automobile was in the garage of the owner on her premises, and had not been removed from it after the death of his brother-in-law until sold after the theft of the tires. It remained there, and when Alexander found a would-be purchaser he would take him to the garage, show the car to him, close the doors and go away. This garage was on the homestead of the owner. This was a theft case, the indictment charging the theft of automobile tires that were taken from the automobile in the garage.

It is laid down as a correct proposition that possession must be alleged in the person having actual control, care and management of the property at the time of the fraudulent taking. A great number of these cases will be found collated by Mr. Branch in his Ann. P. C., p. 1323. It is also laid down that if an employe, servant or person in charge of the property at the time of the taking had more than the mere custody thereof and had actual control, care and management of the property, at the time not under the immediate supervision of the general owner, possession must be alleged in such employe, servant or person having such possession. The cases are cited by Mr. Branch on the same page supporting this proposition. Mere custody is not possession. This is supported by an unbroken line of cases found listed on the same page of the same work. Property in the mere custody of a servant or other person must be alleged to be in the possession of the owner and not in such custodian. Many cases will be found collated by Mr. Branch in his work to sustain that proposition. Mr. Alexander's agency, employment or whatever it may be termed with reference to the automobile, did not extend beyond his authority to sell and dispose of the property. The fact that Alexander slept in the house owned and occupied by his sister, who was the real owner of the automobile, did not thereby constitute him owner by exclusive control, care and management of the premises, garage, or the auto in the garage. The premises was the property of his sister and occupied by her as her home. The fact that he slept in her house did not make him the owner and did not constitute in him exclusive care, control and management of the property. The auto had not been out of the garage at any time after the death of his sister's husband. His ownership consisted of his right

to sell the property. If this right to sell constituted ownership in him, then all sale agents, employes and clerks would have such exclusive care, control and management of the property as to constitute them owners, though working under the immediate control of the real owner. Many illustrations might be given, but it is deemed unnecessary. The facts do not show exclusive care, control and management in Alexander, and do not show membership in him in fact or in law. Had he taken the auto out of the garage to exhibit it for sale, or had he driven it around on the streets with a view of selling it as agent, it is not to be held that he thereby would have control of it in such manner as to allege ownership in him. In fact, this would not constitute in him exclusive control, care and management of the property. These questions were very fully and thoroughly discussed by this court in Frazier v. State, 18 Texas Crim. App., 434, and Bailey v. State, 18 Texas Crim. App., 426. A great many cases have with uniformity followed these cases. Many illustrations are given in those cases showing the distinction or difference between custody and ownership under the idea of exclusive control, care and management. The authority to an agent to sell a horse or cow or automobile, while the real owner retained possession of the property, holds it on his own premises, would hardly constitute that agent the owner under the idea of exclusive control, care and management, and it certainly would not authorize him to be called the owner in fact or in law.

There is some contention that the bills of exception are insufficient to raise the questions suggested by them. These bills are somewhat indefinite, and are referred to largely with a view that the matters might not arise upon another trial.

There is one question that is urged with some degree of interest; that is, that the State was permitted to show that some time previous a party had driven an automobile to the town of San Angelo and placed it in a garage for the night, and one or more of its tires disappeared and subsequently appellant was found in possession of the tires supposed to have been taken from the car. Objection was urged to this on several grounds. The writer is of opinion that the bill is sufficient, but concede that it is not to raise the question of hearsay; it is contended this testimony was admissible because of the fact that appellant filed a plea for suspended sentence. We do not understand this evidence would be admissible upon that theory. Appellant's general reputation might be introduced under that plea where it becomes an issue in the case, or it might be proved, under the decisions, that conviction of offenses under complaint and indictment filed could be used for this purpose, even though they might be misdemeanors of no important magnitude, but none of those matters are shown by this bill of exceptions. The mere fact that tires disappeared from the auto at night and were subsequently found in appellant's possession after a considerable length of time would hardly be admissible to attack his reputation from any viewpoint. Former conviction, former indictments or complaints and

informations may be admissible, but not the fact that appellant was found in possession of property supposed to be stolen long subsequent to the taking without any charges or conviction. We are of opinion that the evidence was not admissible, and upon another trial if presented as here presented it should be excluded.

The motion for rehearing is overruled.

*Overruled.*

PRENDERGAST, Judge, dissenting.

MORROW, Judge.—I am in doubt about the accuracy of the conclusion reached by the Presiding Judge with reference to the question of ownership. I am inclined to think the proof of ownership sufficient. I concur in the reversal, however, for the reason that the issue of guilt or innocence was quite closely drawn in the evidence, and the scale may have been turned against appellant by the introduction, over his objection, of the transaction with reference to automobile tires discussed in the latter part of the opinion. This evidence, I think, was inadmissible; at most it was merely a suspicious circumstance tending to connect appellant with the transaction which was not shown to be criminal and which even under the broad rules obtaining with reference to attacking the character of an accused who enters a plea for suspended sentence was, in my opinion, not admissible.

June 28, 1918.

PRENDERGAST, Judge (dissenting).—The brief and argument by the district attorney, Hon. J. A. Thomas, is so clear and convincing that this case has been erroneously reversed. I will condense and adopt it as my opinion. It is:

The majority erred in holding that the testimony of W. M. McCarty as to another theft by defendant of an auto casing or tire was inadmissible. It is proper for the court to permit proof of other offenses and transactions for the purpose of enabling the jury to determine whether they will recommend a suspension of sentence. Appellant had applied for a suspended sentence.

W. M. McCarty testified to the effect that in the fall of 1914 or spring of 1915 appellant stole an automobile tire one night and was caught with it next morning, and returned it, or had it returned. Williamson v. State, 74 Texas Crim. Rep., 289, 167 S. W. Rep., 360; Turner v. State, 73 Texas Crim. Rep., 16, 163 S. W. Rep., 705; Conaster v. State, 75 Texas Crim. Rep., 91, 170 S. W. Rep., 314-316; Backus v. State, 77 Texas Crim. Rep., 653, 179 S. W. Rep., 1166; Medlock v. State, 79 Texas Crim. Rep., 322, 185 S. W. Rep., 566; Williams v. State, 79 Texas Crim. Rep., 329, 188 S. W. Rep., 430.

The majority erred in holding that it was error for the lower court not to charge that the State having put the statement of appellant as to how he came by the stolen property in evidence, it was bound thereby

unless it had shown the falsity thereof, *when no such special charge had been requested, and the main charge not excepted to on that account.* On this question the decisions are uniform in holding that a direct charge telling the jury that if they believe he bought the property as claimed or have a reasonable doubt thereof, they will acquit, is not only sufficient but is preferable to the general form. When actually caught with the stolen tires out of the burglarized house appellant claimed to have bought them at such a time and place as that in and of itself was sufficient to show his claim was false. The court charged the jury in direct language as above suggested. Webb v. State, 69 Texas Crim. Rep., 413, 154 S. W. Rep., 1013; Bowen v. State, 65 Texas Crim. Rep., 46, 143 S. W. Rep., 187; Hawthorn v. State, 62 Texas Crim. Rep., 114, 136 S. W. Rep., 776; Whitfield v. State, 77 Texas Crim. Rep., 485, 179 S. W. Rep., 558; Childs v. State, 193 S. W. Rep., 664.

Only fundamental errors in the charge of the court will be considered on appeal, when not excepted to and no correction thereof by special charge sought before charges are read to the jury. The omission in the charge referred to by the majority was not error at all, but, if so, certainly not fundamental. It was not excepted to by bill and not complained of in appellant's brief. Crosset v. State, 74 Texas Crim. Rep., 440, 168 S. W. Rep., 548; Holder v. State, 81 Texas Crim. Rep., 194, 194 S. W. Rep., 162; Grider v. State, 82 Texas Crim. Rep., 124, 198 S. W. Rep., 579.

The majority erred in holding that the testimony did not show appellant's possession of the stolen property to have been recent. Even if possession of stolen property be slightly remote (which will be shown below not to have been the case herein), the conviction will, nevertheless, be sustained if there are attendant facts and circumstances supporting the theory of guilt.

Will Ede testified that he had sold the three stolen tires to W. A. Guthrie prior to his death and identified these stolen tires as being the same ones so sold, after having examined the serial numbers and finding they were the same as the ones he had sold; that no two tires were put out by the factory with the same serial number; these tires were Goodyear P. D. All Weather Non-Skid tread 33x4 size. B. C. Alexander testified that W. A. Guthrie died in November, 1914, and at the time of his death he owned the car having on it these tires. After Mr. Guthrie's death this car with these tires on it, was kept in the garage at his sister's (Mrs. Guthrie) home. After he decided to sell the car he visited the garage on three different occasions, and between the first and second visits a week or two elapsed. Between the second and third about one week; on the occasion of the second visit he found two of the tires missing from the auto. The latter part of February, 1915, when he made the third visit to the garage, the remaining two tires were gone from the car. The garage was closed and the doors fastened after each visit, and was kept closed all the time. Appellant

lived in the next block. When the deputy sheriff, John DeSpain, inquired of appellant about the tires, and proceeded to inspect them as to serial number, he found appellant had placed the numbers of all the tires on the inside, and witness had to get under the car in order to examine them, and appellant at that time stated to the officer that he *got two of the tires from a white man on the high hill this side of Ballinger during the big snow in the winter preceding, paying him $15 for them,* and that he was by himself, and that he got the third tire from a little boy about fifteen years old in the town of San Angelo, and said he could show the boy to the witness. This statement was made at the time of his arrest, which was May 22, 1915. Mr. Buck, the auto purchaser, stated to B. C. Alexander that the loss of the four tires would make $100 difference in the value of the car, the car afterwards selling for only $200 without the tires.

Sam Crowther, weather observer, testified that the big snow that year was on March 9, 1915. T. H. Green, another deputy sheriff, testified that subsequent to the conversation he had had with John DeSpain the appellant told him, this witness, that he got the tires from a man sixteen or seventeen miles in the direction of Keith's ranch at a time when he had had a blow-out on the road, and that another man was with him when he bought the tires, and said nothing about any snow or about having gotten one of them from a boy in San Angelo. Appellant could not and did not give the names of any of these different persons from whom he claimed to have bought the tires. 25 Cyc., 141; State v. McRae, 27 S. E. Rep., 78; Stephens v. State, 69 Texas Crim. Rep., 379, 154 S. W. Rep., 996; Von Emons v. State, 20 S. W. Rep., 1106. The facts in evidence show a clear case of possession of recently stolen property, only about three weeks after the theft. Carr v. State, 24 Texas Crim. App., 562.

The majority at first erred in holding that the facts proven would not constitute B. C. Alexander special owner of the house burglarized and property stolen. Possession and ownership of a house burglarized, and of property stolen therefrom, is properly laid in a person who has actual care, custody and control thereof, he being in law the special owner, and this is equally true though some other person may at the same time be exercising with him a joint possession and control thereof. B. C. Alexander testified: "I am a brother of Mrs. W. A. Guthrie. Her husband died in November, 1914. *When I decided to sell the car,* I went to the garage and looked at car and garage, found it all intact. Brought Mr. Buck up, to whom I tried to sell the car. I went and got Mr. Buck the second and third time, to make sale to him. My sister, Mrs. Guthrie, was in very poor health at that time, and I was in charge of her business, looking after it for her, and had charge of her property and premises. I was manager of that estate for Mrs. Guthrie. I didn't own that estate, but I was in charge of it, and had possession of it and was in charge of that garage. I wasn't in charge of Mrs. Guthrie's domestic affairs, but was in charge of her financial affairs.

I had the Guthrie homestead in my charge for sale, and I have a big sign on the vacant lot now, 'For sale, apply to B. C. Alexander.' I had charge of this property, by Mrs. Guthrie's authority, in 1915, as temporary administrator, and afterwards, I couldn't give the exact date, but it was some time in February that I missed these tires. I don't know whether I had been relieved as temporary administrator of the W. A. Guthrie estate at that time or not, but I was then and am now in charge of all of Mrs. Guthrie's financial affairs, and I was in charge of all of her estate, looking after it, and rendering it for taxes, and attending to all of it for her, by permission of Mrs. Guthrie for sale. She transacted no financial business at all except through me. Mrs. Guthrie was living there on the property and her mother was living there with her. This property did not belong to me, but was in my possession, for sale, and that is all, I guess. The authority I had was to sell the property, and I sold the car. I didn't sell the homestead. . . . The automobile was not my personal property, but I had control of it for the purpose of selling it. It belonged to Mrs. W. A. Guthrie. That homestead didn't belong to me. It belonged to Mrs. W. A. Guthrie. She was living on the property at the time. She had been living on that property and the property back of where she now lives ever since she married. The property has been used as a homestead and for living purposes, and has been offered for sale at different times and in different ways. I didn't own the property. I simply had control of it. . . . When I decided to sell the car, I went out there and the doors to the garage were closed at that time. . . . I think it was three times I went with Mr. Buck to the garage to see the car, while trying to sell it to him. After I found the doors open and missed the tires, I fastened the doors again. . . . I locked the garage after I found the first tires missing. . . . Those doors were locked and kept closed, except when someone entered them without my permission. I had authority from my sister to do what I did. I did have the authority to do the things I did, and I lived in the house with my sister, slept there, occupied a room there, and I was living on those premises with my sister as my home, during the time I have been testifying about, and had free access to all parts of the premises, and had my sister's consent to admit persons to those premises and to this garage. If those premises should have been needing repairs, I would have attended to that. I had entire authority to sell those premises. If this defendant or anyone else had undertaken to steal a tire or anything else out of that house, I had authority to have prevented it at that time. . . . My sister was in a very nervous condition at those times, and didn't attempt to attend to any business at all. She looked to me to attend to her business matters for her. There were no restrictions as to my free access to that place or the premises or any part of it. I was in control of the out premises on the place. I was looking after my sister's outside affairs. She didn't pay any attention to the financial affairs or the upkeep, but through me—she left everything entirely in my

hands.    Alvia v. State, 60 S. W. Rep., 551; Johnson v. State, 88 S. W. Rep., 813; Lamater v. State, 42 S. W. Rep., 304; Clark v. State, 57 Texas Crim. Rep., 649, 126 S. W. Rep., 12; Lewis v. State, 72 Texas Crim. Rep., 377, 162 S. W. Rep., 866; Powers v. State, 72 Texas Crim. Rep., 290, 162 S. W. Rep., 832.

Since Judge Davidson's opinion herein, Judge Morrow has written now holding the proof of ownership was sufficient.

It has been held in an unbroken line of decisions, a number of which are cited above, that when an application for a suspension of sentence is made, the question of the defendant's reputation and of his *character and habits of life* become an issue in the case, and that testimony along that line is pertinent.

There are other circumstances, besides being caught with the stolen tires, very strongly indicative of appellant's guilt, such as the effort of concealment by placing the serial numbers on these tires all on the inside, and the three different explanations which he gave of his possession, and also the wholly unreasonable character of the explanation given by him at the time his possession was first challenged by the witness John DeSpain, for it could hardly be contended as unreasonable that two people would meet and stop each other "on a high hill this side of Ballinger" when the ground was covered by a big snow and dicker over a sale of auto tires.    Neither is it reasonable to suppose that a man would haul a big load (as defendant stated) of secondhand casings in such weather between the towns of Ballinger and San Angelo, because if· gathered at San Angelo they could readily be shipped there without carrying them to Ballinger and vice versa.    The most unreasonable part of this explanation, however, is the fact that he claimed to have bought the two tires for $15 when, according to the testimony of B. C. Alexander, and in the opinion of Buck, the purchaser of the car, the tires, though second-hand, were worth $25 apiece, instead of $15 for two.

In pointing out the error of the original opinion as to recent possession, the argument naturally falls into two lines of thought.    The first, and the one which, of the two, would seem to be the less essential to the State's case, is that, if it conceded (though it will appear hereafter that this is not true), that the possession shown is along the border line of being too remote, under our decisions, yet there are attendant facts and circumstances in the present case which so aid the theory of appellant's guilt that the conviction is amply sustained.

In the Bragg case, 17 Texas Crim. App., 219, cited by Judge Davidson in the original opinion on this issue, there were no attendant circumstances.    The defendant had not made ever an unreasonable statement nor a statement of any kind, as compared to the several conflicting statements in this case, together with concealment, and other attendant circumstances, as hereinafter pointed out.    The court there said:  "This conviction *rests solely* upon the presumption from possession" and the most careful search through the report of that case does not disclose a

single further circumstance to argue the guilt of the defendant, and since "five and a half or six months" had elapsed the court held that possession alone and unsupported by other circumstances was not sufficiently recent.

The Menchaca case, also cited in the original opinion, 125 S. W. Rep., 20, was a case of stolen jewelry, and it was stated in that opinion that possession was the only proof of appellant's guilt. Now it is recognized that the rule as to recent or remote possession varies according to the nature of the articles. "Possession will raise a presumption of guilt in the case of property which does not readily pass from hand to hand at a time more remote from the theft than in the case of property readily transferred." (5 Cyc., 141.)

Jewelry is much like money, of which, the McRae case above held, possession for two or three days was not sufficiently recent. Auto tires are usually kept on the car until worn out. It has been mentioned that an effort at concealment had been made by placing the serial numbers of the tires inside, and it is at least possible that this circumstance alone caused the failure of the officers to discover the stolen property for the period of time shown. Defendant lived in the next block from the scene of the burglary. Then another circumstance to be considered in connection with his possession to show defendant's guilt, is the unreasonableness of his explanation, as hereinbefore pointed out. We also have the three conflicting stories told by him as to how he came by these tires; the further fact that neither the man on the high hill this side of Ballinger, the little boy in San Angelo, nor the man sixteen miles in the direction of Keith's ranch, with each of whom he claimed to have made a square deal in connection with these tires, were produced as witnesses; also the fact that he couldn't give the names of any one of these three mysterious personages, and that he never did even point out to John DeSpain the little boy, as he said he would, and he had had more than two years between his first arrest and his trial in which to have looked up these characters, historical as they are in theft cases in Texas, and he failed to do so as to each. (At this point, while not a part of the record proper, it is part of the case's history and we feel it should be explained, that soon after the first indictment was returned in this case, there was a change of district attorneys, and as the new man happened to be disqualified to prosecute, the case was continued for one term, and perhaps another time owing to sickness of defendant's counsel. . The first term of court after the present State's attorney came into office, a motion was made to quash the indictment and sustained. Defendant was properly reindicted at the May, 1917, term and tried at the September term following, resulting in this conviction. We think it proper that the court should understand the cause of the unusual delay.)

That the various conflicting statements made by the defendant are to be considered as one of the circumstances constituting evidence of

guilt is expressly held in the case of Stephens v. State, cited above, in which this language appears:

"Where defendant gives more than one explanation, the conflict in such statements may be considered by the jury in determining whether they are reasonable and probably true; and, under such circumstances, it has been held that the judgment will not be reversed on appeal."

The Von Emons case, by Judge Davidson, comments on another such case where the variety of explanations was slightly greater, even than in the present case.

In the case of Yates v. State, 37 Texas, 202, cited in support of the original opinion, we find the following language:

"Possession of stolen property, however remote from the date of the theft, may be said to raise a presumption of guilty possession; but that presumption must necessarily greatly diminish as time elapses, until it becomes so slight as to hardly make an impression on a reflecting mind.

"Mr. Bishop, after reviewing many decisions on this question, seems to come to the conclusion that the simple possession of stolen goods, however recent after the theft, does not raise a sufficiently strong presumption of guilt to warrant a conviction for that crime. (The rule is settled to the contrary in Texas.) But he says there are nearly always other circumstances and evidence attending that possession such as the character of the party, the *explanation given or refused, or attempts at concealment, which may greatly increase or diminish the presumption* raised by the possession," and in the opinion it was held proper that possession of a feather bed *five months after being stolen should be submitted to the jury along with the other circumstances tending to show guilt.*

What were the specific facts on the question of recent possession? Two burglaries of this garage were shown and as there is only one being prosecuted (there was no plea of former jeopardy as to either), therefore it is proper to apply the facts of this case to the more recent one, which was committed between the second and third visit to the garage by witness B. C. Alexander, though it would make but little difference as to the other. The third visit was the "latter part" of February, 1915; the second, a week earlier. Defendant was found in possession of the tires and arrested May 22, following. So the opinion of the majority erroneously stated even that intervening period of time at "three and a half or four months." Without trying to get too much mathematics into the discussion, it must appear that the time was *less even than three and a half months,* which is the shortest time which any case in Texas ever held to be too remote, and that was in a case of jewelry and where there were no other circumstances to be considered with possession. That is, the present case shows a still shorter period than any case heretofore reversed, and also the fact of possession is supported by a strong array of facts and circumstances corroborating it.

We believe the State is entitled to an affirmance of this case on this point, simply upon the foregoing statement of facts, for we feel that

the court would not be disposed to narrow down or limit the State in making proof of these theft cases, beyond the present rule.

But there is one other outstanding item of proof on that issue, which has not yet been alluded to, and which we are confident had escaped the attention of Judge Davidson at the time he was passing on this case.  That is, that the possession by defendant of these tires was established back at a time within about three weeks of the burglary by his own statement that he "got them the time of the big snow last winter." Sam Crowther, who, as weather observer kept a record of those matters, testified that the "big snow" that winter was on March 9, 1915, which by a reasonable and fair calculation would be just about three weeks from the time they were stolen, and the fact that he had taken the precaution to place all the numbers on the inside may reasonably account for his being able to drive them from the time they were stolen until May 22nd, when he was arrested.

It is true, he also said in this conversation that he bought the tires, but this part of the statement has been proven false by so many facts and circumstances in this case that the jury did not believe it and no sensible jury would.  But it is well settled that the jury are entitled to believe one part of a statement or conversation of defendant and disbelieve other parts.  It is hardly necessary to argue on this point.  It is expressly so held in the case of Carr v. State, cited above, the following being the language used in the opinion by Judge Wilson:

"That portion of the defendant's confession which stated that in burglarizing the house he acted under compulsion of another party was contradicted by the testimony of the party named.  It was for the jury to determine the credibility and weight of the evidence, and in doing so it was within their province to believe one portion of the confession to be true, and to reject as untrue another portion which had been contradicted by other testimony adduced," and the case was affirmed.

So in this case, it was proper for the jury in their discretion to believe that defendant had had the tires for the length of time stated and to reject his statement that he came by them through a purchase, the latter being thoroughly disproved.  This, then, clearly traces his possession back to a period of just about three weeks from the time they were stolen, and leaves no room to question the defendant's guilt of two burglaries, in fact.

Before taking up a discussion of the question of special ownership, we desire to explain that we did not offer the court the assistance of a brief on that point on the original hearing for the reason that appellant did not brief it and made no complaint in his brief on that question. Understanding that counsel for appellant had abandoned that issue and no longer relied upon it for reversal, we saw no occasion to insist that the court should examine our authorities and take up what we felt to be a useless discussion of the question.  This also explains why we originally briefed only one of the other questions which are briefed and discussed herein, for it will be seen upon examination that all the errors

suggested in the original opinion involve questions not raised for appellant in his original brief, except the question as to what testimony is admissible on the issue of a suspended sentence. We know the court desires to do justice to every appellant, regardless of whether his counsel may or may not misconceive the true points at issue, and we feel, also, that the court will be equally willing to protect the rights of the State on this rehearing, even though the omission of its counsel to fully present all the issues in the first instance may have led to errors which justice requires should now be corrected. In the statement under that proposition, we have included every fact in evidence relating to special ownership, both pro and con. B. C. Alexander testified that Mrs. Guthrie, the actual owner, and he both occupied the premises as their home, and that while he did not attend to her domestic or household affairs, he did attend to all *outside affairs;* said his sister was "in a very nervous condition at those times" and didn't attend to any business at all. He was looking after his sister's outside affairs. She didn't pay any attention to the financial affairs or the upkeep but through him. And the last statement in this witness' testimony is, "She left everything entirely in my hands." In the early part of his testimony, he says, "My sister, Mrs. Guthrie, was in very poor health at that time, and I was in charge of her business looking after it for her. I was manager of that estate for Mrs. Guthrie."

We think these facts make a very close parallel to the Clark case, above, where the son of an aged father testified: "That the property was in his exclusive management and control. That his father was a man eighty-four years old and had nothing whatever to do with the management or control of the property. He simply had his money invested in the enterprise." And the court very properly held that the son was correctly alleged to be special owner. In the one instance we have a father who from extreme age could not and did not attend to his business, entrusting it altogether to his son. In the present case we have a sister, only recently bereaved of her husband, who would naturally have been in control and have been the special owner if living; a sister who was "in a very nervous condition" and didn't attend to any business at all; who was "in very poor health," and who in consequence, both must and did leave the management of her estate, the business affairs, the upkeep and all matters outside of her household duties, to the brother, as she had previously left them to her husband.

In this state of fact who would be reasonably supposed to exercise more or actual (for we are not now inquiring as to the legal) authority over that property, premises and auto? The witness speaks in more than one place of "when I decided to sell the car." He rendered all the property for taxation. He would see to necessary repairs; he offered it for sale. He decided when to sell and he did actually sell for the consideration he was willing to accept. He locked and carried the key to the garage burglarized. It was he who had the big sign on the vacant lot, "For sale, apply to B. C. Alexander." He had charge as

temporary administrator and *afterward,* and careful consideration of his evidence *will not disclose the slightest difference between his authority before and after.* As a matter of fact there was no difference and he could not even remember when he ceased to be the administrator.

It is true that in the course of a lengthy cross-examination witness said the property was in his "possession for sale, and that is all, I guess," and also said of the auto that he "had control of it for the purpose of selling it," but in a long statement resulting from rigid cross-examination relating solely to that issue, these two remarks are the only comfort appellant could find for his theory of a variance and doubtless the overwhelming preponderance of the testimony to the contrary effect is what caused him to abandon his bill No. 3 on that issue.

The rule established as to special ownership is a fair and reasonable one and we think it clear there is even an overlapping of the rule when approached from one angle to what it would be if approached from another. In other words, the court might hold one person to be special owner in a case on the ground that he had the custody and control of the property when it would also be held under the same facts that another person was special owner, if it had been so alleged. And it seems entirely proper that the rule should be liberal, for it relates to a purely technical matter, and even the statutes have established a number of rules on this question which are purely arbitrary, in order to relieve the question of some of its difficulties.

Mention has been made of Alexander's authority to sell, and in the Alvia case above the alleged owner was only *agent to rent* a vacant house, the actual owner of which *resided in the same city,* and it was held that the rental agent was the special owner. In the Lamater case it was held that the janitor of a school building was properly alleged as special owner of the building and of the children's books inside, which had been stolen. Doubtless these cases would also have been sustained if the real owner in the same city had been alleged, as owner of the vacant house and the board of trustees as owner of the school building. We think in the present case that Alexander, who was manager of all Mrs. Guthrie's business, rendered the property for taxes, paid the taxes, offered it not simply for rent but for sale, decided when to sell and what price to accept, had charge of the outbuildings, looked after their upkeep, attended to necessary repairs, occupied the premises at his home jointly with his sister, all with permission from his sister, Mrs. Guthrie, who did not attend to anything except through him; would certainly present a stronger case of special ownership than either the janitor or the rental agent.

That exclusive possession or control is not required to be shown in the special owner is held in the Powers and Lewis cases above, though as to the witness Alexander we think his authority and control showed to be exclusive. Aside from the rendering it for taxes, paying the taxes, making necessary repairs, attending to the upkeep, feeding the live stock, admitting or refusing admittance to the premises, carrying

the key and locking and keeping doors closed, closing them again after burglaries have been committed, offering it for sale, deciding when to sell and actually selling for a consideration agreed on, and occupying the premises as a home. What is there to be done about a city residence? All these are shown to have been done by B. C. Alexander. And what did his sister, Mrs. Guthrie, do? Nothing. There is no testimony showing she ever rendered anything for taxation or paid any taxes. Nor that she attended to repairs or upkeep. Nor that she ever decided to sell anything or what price she would accept for it or that she did sell anything. The only thing she is shown to have done was to occupy the premises as a home jointly with her brother. He was her manager. He said he was and the facts bear him out. He did all those things by her authority. She did not attend to anything except through him. In fact, we think it plainly appears from the evidence that Mrs. Guthrie was, practically speaking, an invalid and unable to look after her affairs. She became executrix in name, under the will, but there was absolutely no change in the running of the business. Her brother managed it for her afterward just as the same as he did before. He says, "I had charge of this property by Mrs. Guthrie's authority in 1915, *and afterward.*" On the other hand, if Mrs. Guthrie was well and able to attend court, and if it was true that B. C. Alexander was her business manager, as he said he was, why did not appellant produce her to contradict him? The record is wholly silent as to any act of control by her over the premises or property nor is she shown to have ever exercised or claimed any management of her business affairs.

We know that the question naturally arises in the minds of the honored members of this court when considering questions and cases of this kind: "But why did that prosecuting attorney, through his thoughtlessness or ignorance fail to put two counts in his indictment to meet the question as to which of these persons was properly alleged to be the owner?" But on second thought it will be seen that if Mrs. Guthrie was in very bad health and in a very nervous condition to the extent she could not appear and testify in court, then a count alleging her to be the owner would be useless. So it is plain that the very fact which argues so strongly that she did not and could not look after her own business or control her own property made it impossible to allege and prove that she, instead of the brother, who was actually her manager, was in control of the property and premises. We could not prove it because it was not a fact and for the further reason that we had no one to prove it by, if it had been a fact, which it was not. In fact, it seems clear to us that if control had been alleged in Mrs. Guthrie alone and no count included for Alexander as special owner, then there would indeed have been a fatal variance, according to the testimony, and the court would necessarily have given an instructed verdict.

We think the guilt of this defendant stands out boldly and clearly from the facts herein reviewed and since it is but a fair inference from the testimony that to reverse and remand, at least on the question of

ownership, would ultimately force a dismissal of the prosecution and that no reinstatement could be sustained, we are specially anxious for an affirmance. We only desire it upon the facts, however, and believing the facts amply sufficient we hope the court will grant the request of this motion and affirm the judgment of conviction.

This case should be affirmed, not reversed.